**LANE v. FITZSIMMONS STORES, Limited, et al., and six other cases.**

Civil Actions Nos. 3030, 3056, 3073, 3682, 3689, 3690, 3705.

District Court, S. D. California, C. D. March 2, 1945.

Arthur E. Briggs, J. Allan Frankel, David Silverton, and Albert Lane (in pro. per.) all of Los Angeles, Cal., for plaintiff.

90

Baldwin Robertson, Don S. Irwin, Clive W. Johnson (of Mitchell, Johnson & Ludwick), and John H. Blake (of Hanna & Morton), all of Los Angeles, Cal., for defendants.

## McCOLLOCH, District Judge.

In an age when punitive damages and informer recoveries are being re-examined,[1] a construction of a statute that permits an overcharge of less than five dollars to be converted into a claim for more than ten thousand dollars calls for serious consideration. It may be said that Congress made the law, and the Court's duty is to enforce it, but the question remains: Did Congress intend such a result?[2] A great scholar when called from the courts of New York to the Supreme Court of the United States, declared that his new duties consisted largely of interpreting acts of Congress.

It is not my intention to stigmatize the plaintiff. He claims to have had some official encouragement in his activities, and there is room for difference of opinion as to the possibilities for private and individual actions under the statute, else these cases would not have been in the courts for longer than a year, occupying all of the time of a resident judge for more than a month, and engaging a good deal of my time during the past two months; nor do I find it necessary to decide the cases on the questions tried before Judge Jenney, although I think, in view of the amendment of the statute,[3] that many of the questions tried before him could now properly be treated as at large.

When members of Congress suggested to Administrator Bowles that the statute should be amended to explicitly forbid suits based on purchases made by private parties for the express purpose of making claims against the sellers, the Administrator replied that such was not possible under the original Act.[4] Whether or not the Administrator's reply caused Congress to forego an amendment that it might otherwise have made, is not of moment. It is of moment, though, that we have here an administrative construction of the Act, of value in seeking the elusive thing called Congressional intent.

I think, as I said orally, that the statute was intended to give rights of action to consumers when overcharged in the making of their normal purchases. Mr. Lane, granting him the fullest good faith, considered himself to be a private policeman, aiding the Los Angeles O.P.A. in what he felt was too big a problem for them. Incidentally, he intended to claim fifty dollars for himself for each overcharge, though it were no more than a penny. He visited about two thousand grocery stores and about seven hundred fruit and vegetable stands, and made two hundred sixty-one over-ceiling purchases, at a total expenditure of $48.91. He was overcharged $4.48, for which he asks more than ten thousand dollars. He and his family have eaten the food purchased, and that makes him, he feels, a consumer under the Act.

I find that he did not buy primarily for consumption, but primarily to make a claim for a large sum. There is such a thing as the Courts needing to keep themselves respectable. That is Justice Holmes' meaning in the wire-tapping case[5]; that is Justice Brandeis' meaning in the entrapment cases.[6] Congress quickly amended the ancient qui tam statute when the Court ap-

---

1 31 U.S.C.A. §§ 231–234: United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443; United States ex rel. Rodriguez v. Weekly Publications, Inc., et al., 2 Cir., 144 F.2d 186; United States ex rel. Sherr v. Anaconda Wire & Cable Co. et al., D.C.S.D.N.Y., 57 F.Supp. 106.

2 Cf. Sorrells v. United States, 287 U.S. 435, 446, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249.

3 The statute was amended June 30, 1944, 50 U.S.C.A.Appendix § 925.

4 "* * * As regards the fear which has been expressed to the effect that these suits may be used as a 'racket' to trap and plague innocent sellers, the answer is that under the present language of the statute any seller can defend himself if he can show that the buyer was not purchasing 'for use or consumption', i. e., that the buyer bought the article for the express purpose of promoting a lawsuit rather than for actual use as a consumer. * * *" Letter of Administrator Bowles, dated May 17, 1944, recorded in Hearings Before the Committee on Banking and Currency, House of Representatives, Vol. 2, page 2183.

5 Olmstead v. United States, 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944, 66 A.L.R. 376: "* * * the existing code * * * does not permit the judge to allow * * * iniquities to succeed."

6 Casey v. United States, 276 U.S. 413, 425, 48 S.Ct. 373, 376, 72 L.Ed. 632: "To preserve the purity of its courts." Sorrells v. United States, 287 U.S. 435, 455,

plied it literally. (Note 1, supra.) O. P. A. has its own separate legal staff—an innovation. It has its own investigators. And I say, we should be slow to find support in the statute for the broad claim that plaintiff and his able counsel make here, that private citizens may constitute themselves a police force to enforce the statute at great personal profit. It is well at times to look backward as well as forward. In the last war, the serious mistake was made of calling on private citizens to aid in the enforcement of the espionage statutes. That mistake was not repeated in this war. The head of the Federal Bureau of Investigation is entitled to much credit for calling to the attention of Congress the unfortunate consequences of this mistaken policy of the last war, and for recommending that the policing of the home front should be left in this war in official hands. And just lately, one of the finest things that I have heard said about a public officer was the statement that the present Attorney General's record was distinctly free of the blot of the last war, of indiscriminate prosecutions for alleged unpatriotic activities by the citizenry. The war has been well fought on the home front, without that being necessary. These things have their bearing on the question before us.

I said that I did not intend to stigmatize the plaintiff, nor am I intending to excuse the defendants, if they have offended against the regulations. If they have offended, O. P. A. can proceed against them. Two thousand pages of printed record in this Court, giving the facts respecting the alleged violations and the claimed defenses thereto, are available for O. P. A.'s inspection.

The motions for summary judgment are allowed.[7]

457, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249 (separate opinion of Justice Roberts, concurred in by Justices Brandeis and Stone): " * * * true foundation of the doctrine in the public policy which protects the purity of government and its processes" (287 U.S. 455, 53 S.Ct. 217, 77 L.Ed. 413, 86 A.L.R. 249). " * * * the preservation of the purity of its own temple belongs * * * to the court" (287 U.S. 457, 53 S.Ct. 218, 77 L.Ed. 413, 86 A.L.R. 249).

7 I have added the citations in notes 1 to 6 since filing the opinion. District Judges, who do not have law clerks, often find this necessary, the need for quick decision compelling the judges to rely on their accumulated experience.

A well known figure, writing from the appellate point of view, has lately said, it was surprising there were not more reversals. Whether the writer was intending to compliment the District Judges on the quality of their decisions, or to compliment the appellate judges on their restraint, was not stated.

While there are no reliable statistics on the point, the fact appears to be, that appeals are taken in about one out of ten matters, that go to final judgment. And every District Judge knows that by far the majority of the difficult questions submitted to him never reach an appellate court.

Government agencies are the heaviest litigators in the United States courts, and the Interstate Commerce Commission, "the Daddy of all Commissions," early determined to appeal every decision adverse to it to the Supreme Court. O.P.A. appears to be following the same practice. Should this mild rash of administrative self-importance become epidemic, the result may be "to swamp the courts," as Holmes, J., put it (United States v. Sing Tuck, 194 U.S. 161, 170, 24 S.Ct. 621, 624, 48 L. Ed. 917). But this will be a matter for concern "at the appellate level."